Art and Antique Dealers Le v. Seggos Art and Antique Dealers Le v. Seggos  Art and Antique Dealers Le v. Seggos Mr. Trotter All right Mr. Trotter Mr. Trotter, may I please report? U.S. Fish and Wildlife Service has determined that sales of antiques containing ivory and rhinoceros horn, as well as art containing de minimis amounts of African elephant, do not contribute to poaching or illegal trade in wildlife. But New York disagrees with that determination, as well as the federal laws enacted in New York City. As a result of New York's disagreement, licensed dealers, like the members of the two associations in this case, are prohibited from selling the valuable inventories of art and antiques both within and from New York. Because the state ivory law was preempted by the Federal Endangered Species Act, and because the Department of Environmental Conservation's display restriction cannot survive even an intermediate scrutiny under the First Amendment, this Court should reverse the district judge's decision. And how does that jibe with the Endangered Species Act reference to interstate commerce, which is really the limit of what that statute is about? I think when you consider the Endangered Species Act's express preemption provision, I think the best reading of that provision is that what Congress intended was a look at the practical realities of a particular state law and challenge. And I think that's the best reading because of the fact that What is the state allowed to do, or what are you saying is the limit of the activity covered by the state law? The intrastate word, that's the word you injected into your amendment complaint, right? I see now, Your Honor. I think it's in two regards. First is the inherent nature of these items, the products from ivory rhinoceros horn, which come from species that are not native to New York or even the Western Hemisphere. As a result, any state restrictions on these items are necessarily implicating interstate commerce, foreign commerce, applying New York... Intrastate commerce involving rhinoceros horn, period. Is that what you're saying? Correct, Your Honor. Okay. So why did you insert the term in your complaint? It seems to create a lot of confusion. Maybe still. The confusion comes from the text and the purpose of the state ivory law itself. It is written very broadly to effectively permit all trade in ivory, whether it be from the state. Of course, in response to this litigation, the Department said that they apply the law as only an application to intrastate commerce. But as I just pointed out, due to the nature of these items, that's not really possible in this factual circumstance. But also in considering how the Department enforces this law with its display restriction to prohibit trade that even the Department acknowledges that it cannot make. So I think it's the broad language in the statute, but really it comes down to the way the Department is enforcing this with its display restriction. And so turning back to... But even before we get to a display restriction, I mean, it seems to me you're suggesting that they can't even have a sale restriction, right, on rhinoceros horn, because that necessarily implicates intrastate commerce and is therefore covered by the exception to the Endangered Species Act, right? That's correct, Your Honor. You are saying that? Yes, Your Honor. Okay. And so turning back to the language of the preemption provision in the ESA itself with the applies with respect to intrastate foreign... Well, actually, I'm sorry. Can I just go back? I mean, I just... It seems to me that the Fish and Wildlife Service have taken a different view about intrastate and the preemption that they themselves created. They seem to acknowledge that in the trade for African elephant ivory, sales within a state, intrastate commerce will remain generally allowed. And so, I mean, I guess we don't have them here. They're not a party and they're not an amicus, but you seem to be taking a more bullish position than the Fish and Wildlife Service is taking for itself. Well, I will admit that there is that reference in the Federal Register, the 19th, excuse me, the 2016 Amendments Rule. But there is no acknowledgment like that that I'm aware of in the legislative history for the exemption itself in the statute. But seeing that there is some discomfort with the preemption argument, I would like to turn to the display restriction on the First Amendment part of this time. And first, I think it's important to clarify, I think we misstated the request of relief in our opening brief, that if this Court were to reverse the dismissal of the preemption claim, then the Court would not have to address the First Amendment claim at all. And that's not quite right because of the different procedural posture. Of course, the First Amendment claim is here on appeal of summary judgment because the preemption was dismissed. So regardless of how the Court rules on the preemption claim, the First Amendment argument does still need to be addressed. And I'd like to briefly touch upon what we believe is the proper constitutional standard for scrutiny. Of course, this Court in its recent Lugo decision said that the general rule is that even content-based restrictions of commercial speech were seen to intermediate scrutiny. But within that decision, in footnote 7, the Court did lay out four hypothetical scenarios in looking at two Supreme Court cases where a potential case could receive strict scrutiny even in the commercial speech context. But in Lugo, none of those circumstances were present. But here, all four of those hypotheticals are present based on these facts. And so I would say based on that, that strict scrutiny is appropriate. But should the Court disagree in referring to intermediate scrutiny, the display restriction is far more extensive and necessary to address. I'd like to point your attention to another factor. This is a question that is probably more appropriately placed to your adversaries, but I would like to hear both sides talk about it. One of the standards that must be met under intermediate scrutiny is that the State has asserted a substantial interest. And I'd like to hear the perception from both sides of what is the State's substantial interest in forbidding the display of antique items that are lawful to be sold interstate to an interstate customer. This is protecting elephants who were alive 50 and 100 years ago, because the federal definition requires that the object be 100 years old but allows for repairs up to 50 years old. So the lives of elephants are not threatened if they are, except 50 years ago, there's no threatening to the life of any elephant, to the survival of the species. And what's your perception of the State's interest in not allowing dealers to display an item in this context where customers are unlikely to buy a work of art or a work of this nature without seeing it, inspecting it, having the opportunity perhaps to test it for authenticity and so forth? You hadn't focused on that in your briefing. It wasn't focused on because essentially below it was conceded that the State has an interest in limiting the illegal trade in wildlife. I think the items that Your Honor points to, it's actually slightly even worse because antiques, of course, have to contain ivory that's at least 100 years old or mammoth ivory, a species that have long been extinct. But what Your Honor's concern hits at is precisely why this restriction is more extensive than necessary. I'm asking what is the State's interest in forbidding the display of 100-year-old ivory? They've articulated it as eliminating the illegal trade of wildlife. Well, my question, I'll pursue it more with your adversary, but I'm talking about legal trade in ivory. And I agree, Your Honor, and that's precisely why the restriction is more extensive than necessary. The Department offers this one anecdote of an unlicensed seller selling an unlicensed item in spite of a sign that said it wasn't for sale. And so effectively the Department is saying to address illegal sales, it must prohibit basically all legal sales within the State. And that goes far beyond what is necessary to address the State's interest, which is limiting the illegal trade in these items. And if I could just ask in your final moments, does our analysis change in your position if we conclude that it's not a restriction to have limits on what can be displayed, but instead a licensing condition? Well, I think it is very much a licensed condition, but the practical effect of this condition, which is acknowledged by both parties, the Departments, But does it change how we have to analyze it? No, Your Honor. So you would say that even as a licensing condition, it still is subject to either intermediate or strict scrutiny? Yes. Well, you have two minutes for rebuttal. So we'll hear now from your adversaries. So you're going to split your time, is that right? And how many minutes for each, just so I know? Today we'll take nine minutes, Your Honor, and the intermediate is three. Very good. Okay. You may proceed, Ms. Zhao. Am I saying it right? Zhao or Zhao? Zhao. Zhao. Sorry about that. Ms. Zhao, you'll have nine minutes. You may proceed. Thank you. Good morning, Your Honor. I'm here to support Grace Zhao for the State of LA. The Challenged State Ivory Law operates in harmony with the Federal Endangered Species Act by prohibiting the sale of most ivory products within the State of New York while allowing any interstate sales that are permitted under federal law. The District Court correctly dismissed a felon's preemption claim and also properly concluded that the display restriction, which is a separate license condition that helps insure sellers will comply with the law, comports with the First Amendment. I'd like to begin with the preemption claim today. Below, a felon expressly limited their preemption claim and their complaint to the State Ivory Law's application to interstate sales. So what's an interstate sale? If I come from New Jersey to New York to buy an antique piece of scrimshaw, is that an interstate or an intrastate sale? That would be an intrastate sale, Your Honor. The words are so close. So intra or inter? Intrastate sale, Your Honor. So long as the buyer, the seller, and the sale all take place fully within the State of New York, that is an intrastate sale. So, for example, a local retail sale at a new workshop would be an intrastate sale. An online transaction in which a New Jersey customer orders a piece of ivory from his home in New Jersey and it's shipped from New York to New Jersey, that would be an intrastate sale. So if you use the mail, then it's interstate. But if the person comes to pick it up and carry it back, that's intrastate. The inquiry terms, Your Honor, are on where the actual sale happens and the locations of the buyer and the seller. Why? Why does it turn on that? The definition of intrastate sale in the display prescription and as the department is promulgated, it defines sale that way. I think the intuition is that New York wants to be able to prevent the illegal sale of ivory within its borders. So the physical location of the buyer, the seller, and where the sale actually takes place is what's driving the definition of intrastate sale. In view of the priority of federal law, isn't it how the federal law defines what's interstate? That determines what is interstate and what is outside the borders of interstate? I don't see how the state gets to say what is interstate when it's the federal law that predominates. Of course, Your Honor. I mean, if the federal law regards a transaction as an interstate transaction and therefore in certain instances permitted with respect, for example, to antiques as defined in the federal law, that's an interstate transaction that New York doesn't have control over no matter how New York purports to define what's interstate or what's intrastate. Your Honor, New York's definition of interstate and intrastate sale really accord with the federal definition. And I think if you look to the legislative history of the ESA, the subject of preemption was a wide debate. And there during the hearing, representatives who sponsored the final language that appeared in the preemption clause expressly stated that the review was that states should be able to enact more restrictive intrastate sales bans, sales bans within the state, so long as they did not block any commerce across state lines, so long as they did not block any foreign commerce. So New York's application of the state's ivory law respects federal law and does not in any way conflict with the Endangered Species Act or the final goal for African Americans, which is the Fish and Wildlife Service. Well, I mean, does the Endangered Species Act have the same definitions or definitions at all of interstate and intrastate commerce? The Endangered Species Act does not define that, Your Honor. But I think, again, if you look to the legislative history... But this is what I'm trying to figure out. I mean, there's lots of laws that turn on interstate commerce as a basis for the feds to even get involved. And so that term has been defined in lots of different contexts. Is your argument that interstate for purposes of the Endangered Species Act means something different than interstate for other statutes that Congress has passed? No, Your Honor. That's not our position. Well, because here's my problem, and it sort of reveals, I guess, my own background. But if you have a seller of guns in New York and he sells in New York to somebody else who's a New York resident a gun that was manufactured outside of New York, that is a sale, it involves interstate commerce, and it will be prosecuted federally. That's not an intrastate sale. It's not a purely intrastate sale. If the gun, however, was manufactured in New York, never left New York, and was sold here between New Yorkers present for the sale, that would not be an interstate commerce as far as our law is concerned. So it seems to me what you're saying is that we've got interstate commerce meaning different things in different contexts, different statutes. Is that true or not true? We're still clear, Your Honor. I think that New York's definition of intrastate sale is consistent with what Your Honor is saying. So here, an interstate sale would be one in which the buyer and seller are located within the state of New York. Right. Okay. But in the gun context, if the buyer and seller are both located here, but the gun originated in Illinois, it doesn't matter. That's an interstate sale that can be, that involves, that's a sale involving an interstate commerce because the gun, usually interstate commerce involves whether the good travels in interstate commerce, not necessarily where the parties in the transaction are. You are taking a position, New York is taking a position that says intrastate turns on the location, the physical location of the feet of the purchaser and seller. And I'm just trying to figure out whether that's unique to the Endangered Species Act or whether that is how interstate commerce works in all federal statutes. So, Your Honor, in our case, when the sale takes place in New York, the good would also, the hybrid would also be changing hands between the seller and the buyer in New York. Right. But isn't the point, and I think this is the point that your adversary was making a minute ago, Mr. Trotter, is that this is a foreign item. This is a rhinoceros horn from Africa. It's not a gun manufactured in New York State. It is the equivalent of a gun manufactured outside of New York State. And so it has been put in interstate commerce maybe a long time ago and now it's here, but that makes this an interstate transaction. I think that's what Mr. Trotter was saying. I thought that's what he said. So your view is that it really just turns on where the location of the buyer and seller. And where the sale, the transition of the good. Right. I mean, well, there's a sale and it's where they are when the good is changing hands. Right. And I think, Your Honor, the argument that there can be no intrusive sale of objects made from foreign species doesn't accord with the text or the history of the Act or the position of the Endangered Species Act. Or the position of the Fish and Wildlife Service. So you're not telling Judge Sullivan that the federal government would be without power to regulate these sales within New York State on the basis that the objects originated in Africa and not in New York State. You're just saying that the regulation that in fact has been imposed by the federal government on interstate commerce does not take precedent, is not inconsistent in any way with New York undertaking to regulate what happens entirely in New York State between buyer and seller. That's exactly right, Your Honor. But can I interrupt and just give you a little extra one? So imagine then there's a sale in a different state that doesn't have New York's more aggressive approach to items like this. They don't have anything at all. So when the Fish and Wildlife folks try to prosecute what you're calling an intrastate sale in that jurisdiction because it's something that's 75 years old, it's not subject to the exemption, but the argument is this is intrastate. You can't prosecute me, Federal Fish and Wildlife Service, because this is a purely intrastate transaction. That's going to be a defense for a violation of the Endangered Species Act? That it's not intrastate commerce? So I think, Your Honor, that the Endangered Species Act in the Fish and Wildlife Service's final rule for African elephants does not breach intrastate conduct. And I think the final rule actually explicitly says this at multiple points. For example, if you look at page 36416 of the Federal Register document, the agency says, sale in intrastate commerce will remain unregulated under federal law. And this is a two-way street. So states could allow more sales to African intrastates than is permitted under the final rule for African elephants, but by that same token, states can also be more restrictive. And I think the legislative history of the DSA conclusively establishes that Congress intended for the exemption to be construed as narrowly as possible to allow states to enact more restrictive sale bans of both local and foreign species. If you look to the House report accompanying the final preemption language, there, Congress stated that it intended the DSA to be a floor for regulation and that states should be permitted to enact more restrictive sale bans. And if you look to the history of the laws leading up to the Federal Endangered Species Act, states like New York had endangered species laws predating the federal law. And during the congressional hearings for the act, the states asked, what will happen to our laws? And in response, the House report conclusively answers that existing laws like New York's will remain unaffected so long as the state is not directly blocking any sale across state lines or any foreign sales, things like that. So I think here, if you look to the legislative history, and also how this Court has read history for the presumptive Oregon Court received, it makes very clear that Congress did not intend the Court to broadly instruct the exemption clause to block any sort of local sales bans that do not touch on interstate commerce. Well, you've gone over, but there are still a lot of questions I think people have. So I want to get, I think, I know for sure that Judge LaValle wants to ask you questions about the state's interest in the display ban. So we're going to go there. We'll go over and we'll give Mr. Trotter extra time as necessary. It's an interesting case with lots of interesting issues. So you can ignore the red light for now. I don't usually say that. But, Judge LaValle, I don't know if I'm putting you on the spot or you want to get to that question later. The Court is more precise than simply the state's interest in the display ban. It relates to the state's interest in preventing a display of an item, proposed an item that is lawful to be sold to an out-of-state purchaser when that out-of-state purchaser wants to see the item, an item that is an antique and is lawful to be sold to this out-of-state purchaser, but he wants to see it. What is the state's interest in preventing the dealer from showing this antique to an out-of-state purchaser? So, Your Honor, the state's interest is to prevent the unlawful sale of an ivory item within New York as it's defined under the state ivory law. How does it do that? This is an item that's lawful to be sold. It's a distinct item. The fact that you have an interest in preventing the sale of items that cannot lawfully be sold, but this is an item that can be lawfully sold and has no bearing whatsoever on the survival of elephants in Africa because it involves only elephants 100 years ago. What is the state's interest in not allowing that to be shown? So, Your Honor, in this case, the state has taken a more aggressive conversation. I know it has very much more so, but I'm asking you what is the state's interest that justifies that aggressiveness. So, I think in this case, Your Honor, not only is it an antique exception, but also the de minimis exception. Yes, but I'm asking you about the antique exception. What is the state's interest? I understand you might have an interest in the other exception, which can relate to contemporary elephants, but the antique exception can't. So, where is the state's interest? I think the state's interest, Your Honor, is really its policy judgment that only bona fide antiques containing less than 20% ivory should be allowed to be sold within New York, and I understand that that is not a position that is reflected in the federal antique exception, but that was a lot— But you're saying, essentially, our state interest is in enforcing our law, and we've made it unlawful. But what's the justification for that? What interest is served? I think, Your Honor, in this case, the state has determined that the best way to promote conservation is to more narrowly circumscribe the amount of antiques that can be shown in New York, and perhaps the state interest comes from the fact that before the enactment of the state ivory law, which had these more narrow restrictions, New York was a hub for trade in ivory, contributing to the demand in ivory. There were thousands of items that were being shown and sold in New York, and that's reflected in the record, and I think in light of what— I'm focusing the argument, or at least what seems to me the best part of the argument of your adversary, focuses on a particular thing, a particular type of merchandise, which is antiques involving only elephants 100 or 50 years ago, and that are lawful to be sold to purchasers from out of the state. And I have yet to hear you explain in any way other than by generalities that we are—that, oh, you know, we've determined that this is bad or it shouldn't be shown, but one of the qualifications for a valid restriction on speech is that the state have a substantial interest, and I just don't see that there is any interest, much less a substantial interest, in not allowing the showing of these antiques to a lawful purchaser. Senator Arnott, maybe to answer your question in a different way, the federal government has determined that the antiques should be— these types of antiques that fall under the federal antique exception are permitted to be sold in interstate commerce, but the federal government has not made any sort of determination as to whether these antiques should be allowed to be sold interstate. It's simply not— I'm not talking even about the sale interstate. I'm talking about the display to an out-of-state purchaser. We're not talking in any way about transferring. But at the same time, the question could go further. What is the state's interest in not allowing the dealer to hand an antique to an out-of-state purchaser who's a lawful purchaser? What's the state's interest? And say, no, we have to mail it to you. We can't hand it to you. So the state's interest is preventing the sale of that item then and there, which federal law does not regulate. Federal law does not restrict sales. And I think the important thing is— See, the—I focus on the display part because that's the part that relates to a speech restriction, and the law is more sensitive under the First Amendment about speech restrictions. Yes, and I think, Your Honor, that the display restriction accords with the First Amendment and has a reasonable fit with— And I'm asking you, how does it accord with it with regard to the necessity of a substantial state interest in not allowing an antique to be shown to an out-of-state purchaser? So, Your Honor, the display restriction is very narrow. It only prevents the physical display in the state of New York while allowing that item to be displayed outside of New York. A dealer could take it across the border. A dealer could take it to a trade show outside of New York. It also allows dealers to advertise lawful interstate sales through any other medium. They can do so in print. They can do so online. They can do so in catalogs. You're telling—you're addressing a different question than the one I'm asking. You're addressing whether the restraint goes too far, whether there are other things that can be done. You still have said nothing about a substantial state interest in not allowing this to be shown in circumstances where purchasers simply won't buy without being able to look. Your Honor, to answer your question about that, I can't. The display restriction is intended to prevent an unlawful interstate sale, and that's the state interest that the district court has recognized. And it's also a substantial interest that appellants have conceded in this case. Appellants and the district court all recognize that the state has an interest in defining what types of items can be sold within the state as it relates to endangered and threatened species. And here, the display restriction very narrowly targets and prevents that type of unlawful interstate sale while allowing ample channels of alternative means to advertise unlawful interstate sales. What I think you're saying—and you can tell me if I'm wrong— I think you're saying is that the state interest is to reduce as much as it can the sale of ivory. And because of state and federal law, the display restriction was the outer bounds of what New York State thought it could do without running afoul of federal rules. Is that basically what you're trying to say? You guys wanted to go in the margins as far as you could to try and reduce the overall sale of ivory because you have some theory from, I guess, Captain Kaluk, that sales in general lead to harming of wildlife. But it's correct, Your Honor. Okay, so I think what Judge LaValle is having trouble with is that you need to be more specific about how that interest of reducing the quantum of sales, because you have this theory that that's going to lead to preventing future harm to animals, is met by this particular display restriction. So the display restriction reduces the quantum of sales that take place in New York because the state ivory law says that most in-person sales in New York are lawful. And the display restriction really furthers that and tamps down on the amount of intrastate sales, which are lawful in New York, from taking place. Because if the state has determined, and also the state witness has testified, that when an item is allowed to be in the presence of a buyer and seller within the state of New York, that it's likely, or that it's more likely, that an intrastate sale will happen. There's simply a temptation to do so if it's a platform law. My question was not meant to imply that you can't have a display restriction. My question only challenges the issue of why doesn't the display restriction exclude from the display restriction displays to out-of-state purchasers, not that you can't have, not that the display restriction is on its face in all regards unconstitutional under the First Amendment. Understood, Your Honor. And I think the answer to your question is that when an out-of-state purchaser comes into New York to examine ivory, they've already demonstrated their interest in purchasing ivory. So allowing that buyer to inspect the ivory then and there gives rise for the opportunity for, and also the temptation to engage in an immediate sale in New York. And that sale would be unlawful. It would be an unlawful intrastate sale. And I think both the testimony of Captain Pollock and also common sense and intuition both state that that's the case, and that the state ivory law really intends to mitigate a precursor to an unlawful intrastate sale. And I'd just like to highlight again, Your Honor, that the display restriction does not prevent all physical display. The dealers are permitted to take the ivory out-of-state. You can take it to trade shows. And, in fact, the evidence shows that dealers do go to trade shows out-of-state, and that, in fact, intrastate sales are still happening to this day. If you look to the record at 127 and 131. Therefore, it's simply not the case, Your Honor, that the display restrictions have tamped down on or eliminated all intrastate sales. And I think for those reasons, the display restrictions have a reasonable fix. Okay. Can I just ask one last question? At the motion-to-dismiss stage, you seem to have questioned whether or not the display restriction even qualified as commercial speech. Have you guys awaited that right now? Is that correct? We're not advancing that runway here, Your Honor. And I think we don't need to because the display restriction can't be satisfied with essential heads of text here. And I think, Your Honor, I'd like to emphasize again that the only problem with essential heads of text that's in dispute here, that we've raised and that's been preserved, is the fourth problem, whether the display restriction has a reasonable fit. Dealers have conceded below that the restriction directly advances a substantial state interest. So those issues are really not before this Court. The only issue is the fourth problem with essential heads of text, which talks about fit. All right. Well, you got your money's worth. We'll now hear finally from – well, not finally, I guess, from Mr. Henry for three minutes, give or take. Sure. Thank you, Your Honor, and please support. I'd like to focus on the preemption claim because my clients advance these sorts of laws around the country and don't always do so with the associated display restrictions that New York judges would advance here. However, I do want to respond to the recent topic just a bit. I don't have a different answer than the state's attorney does with respect to why the state can't show in person an item to someone from out of state who could buy that as an interstate transaction other than to say that it seems logical that in-person display is something of a practical precursor to in-person sales. And that's what the state has fairly prohibited. Well, it might be also a precursor to mail sales. Maybe so. Maybe so. Although I do think that there are other vehicles via interstate channels, pictures online, those sorts of things to advance that. But I guess my client's interest in the vein of that conversation is just to emphasize that the sale of even antique items at a higher level doesn't really go to the point of in-person display. The sale of antique items, even from elephants that were killed a long time ago, increases the commodification of the parts of those species and thus increases stress to those species in the present. And even the federal government's antique exemption, which extends to, I guess, 100 years old, still doesn't reach items that are old, 50 years old, that are from elephants who were long dead. So I just want to note that beyond the specific question about in-person display, there is certainly a conservation rationale for banning the sale of items that were procured from animals that are long since dead because of the increase in commodification of those animals in the present. But I'd like to focus my short time here on the preemption claim. I think the state has addressed adequately, and our briefs go as well, and the Court points out that the ESA preemption clause and the Antiques and Divinities of Quantity provision of the Federal Elephant Rule only reach interstate activities. The state's choice to interpret its ban on sale and purchase narrowly would apply only to a situation where buyer, seller, and product are within the state is one that removes it from any conflict with federal law. The federal government has indicated, even if it could as a matter of policing interstate commerce to prohibit wholly intrastate transactions like those described, that it is not going to do so. The federal government, the U.S. Fish and Wildlife Service, does not go interstate as a matter of enforcement of ESA and restricts transactions that occur between a buyer, seller, and a product within the state. On the field, Plankton has now emphasized, as Judge Sullivan pointed out, that even an entirely intrastate restriction, one where seller, buyer, product are within the state, like the New York Agri-Law, nonetheless somehow comes within the scope of the express preemption clause of ESA because it has some incidental practical effects on their preferred import and interstate activities. Under Plankton's view, exactly zero intrastate restrictions would survive then because these days all such intrastate restrictions will have some incidental impact on activities outside the borders. But I want to note that Plankton's attempts to sort of push these intrastate restrictions into the scope of the preemption clause fails for another reason, and it's another reason that I don't think gets as much attention as it deserves in our briefs, so I wanted to mention it here today. And that is that even if the New York Agri-Law is a state law that does apply to intrastate commerce, in fact, even if the state had interpreted sales to apply to transactions where a seller is within the state of New York and a buyer is outside the state of New York, and it occurred online, the ESA only voids state laws that both apply to intrastate-reported commerce or import or export and, in the case of state restrictions that are more protective than the federal law, which is the case here, that prohibit what is authorized by, quote, exemption or permit, end quote. And that quoted language is from the ESA's express preemption clause. That language is largely ignored by the plaintiffs, and that's important because there is no such permit or exemption here. The eligible, the federal eligible, and its antiques and de minimis quantities provisions are not an exemption for purposes of the ESA's preemption clause. Colloquially speaking, maybe the term exemption could refer to any time that a government entity chooses not to apply to a full host of prohibitions. It might apply to something. But in the context of the ESA, exemptions and permits are specific things. And so when the plaintiffs throughout their public briefs say, the exemption that's in the federal eligible, the exemption that's in the federal eligible, they're speaking sort of in common parlance as opposed to speaking the ESA's language. We know that permits and exemptions are specific things for purposes of the ESA and congressional intent as to what huge state law should actually be displayed by federal law for a few reasons. First, the text of the ESA itself. ESA is a permitting scheme. Section 9, once the species list is in danger of threatening, Section 9 affords the species a whole host of protections in the nature of a bunch of prohibitions. And in Section 10, which is titled the Exemption Section to the Act, the first four paragraphs of that section are known as the permit and exemptions policy. There's no coincidence there that there's a parallel between that language in Section 10 and the language of the express preemption clause in terms of congressional intent of displacement of state laws. Section 10 is at 16 U.S.C. 1539. The first four paragraphs are A to D. Paragraph A talks about what a permit is. Paragraph B talks about what an exemption is. It defines those narrow activities that can be authorized affirmatively by the federal government via the exemption of permit. And then paragraphs C and E create a process. It's a robust process. It involves public notice from the Federal Register. It involves agency findings from the Federal Register. And at the end of the day, an applicant either gets or does not get an actual permit or an actual exemption. The Crescenti case out of this circuit makes clear that it is those Section 10 permits and exemptions that I just described that the express preemption provision of the ESA in Section 6F of that act, that's at 15 U.S.C. 1535.6. Paragraph F. That it refers to, and I'm speaking here specifically to the district court opinion in Crescenti, because this circuit affirms that, in a very short opinion, it just says it's affirmed for substantial reasons offered by the federal opinion of the district court. And so I would point the court to 658. That's 1441. That's the district court opinion in Crescenti, and specifically the first sentence of page 1446, where the court makes very clear that exemptions and permits are specific things. And in that case, which are these exemptions and permits for purposes of Section 10 of the ESA, and in that case, the plaintiff said, well, we have this license from the federal government. And the court said, but that's not the type of permit or exemption that triggers the ESA's preemption clause that says state laws, which are expected to be, hoped to be more restrictive and more protective than the ESA, are only void if they apply to interstate or foreign commerce, which this one doesn't, which is the reason the district court offered here and the reason why it's opinionally affirmed. But also, only if they restrict what the federal government authorizes to be an exception of permits, and those are specific things. The elephant rule and its amendments and properties enhancing the exemption provisions are not exemptions or permits for purposes of the ESA. So maybe I'm confused. So there is an exception that allows for antiques, right, in interstate commerce. And you're saying that New York can ban even interstate commerce involving elephant artifacts, and that would still be okay under the ESA? That's correct. They could ban possession. They could say nobody can even possess this. This is like heroin in New York, and if you've got it, you go away for 10 years. If you've got ivory, you're going away for 10 years. They could do that. I think they probably could, depending on whether or not there was a – as long as it was not an exemption or permit that specifically authorized that activity. The ESA contemplates and consistently legislates this during our brief, as well as it's discussed thoroughly in H.J. Or do you mean that it's – the exemption has to be specific to the piece? That's a good question, Your Honor. I'm glad you asked it. It's not specific to the piece, but it's not just general to any activity. The exemptions or permits that are offered under Section 10 are specific to certain types of activities. Those activities are spelled out in the exemptions. So they refer to things like enhancing the survival or scientific research where there's an economic hardship exemption. And those are the ones – Well, is there one for sale? There can be one that includes sale. So, for instance, the permits that plaintiffs had in some of the cases that plaintiffs here refer to, the 40-year-old cases of manpain, those sorts of cases, those were Section 10 permits. They were issued pursuant to the rules in place at the time, which have changed. So the elephant rule in place at the time of, say, the manpain decision, which is reproduced within the manpain decision, so sometimes it's hard to find an old version of the rules. That's going to be – it was the 1981 version of the elephant rule. It's the very first one. But I don't really understand the pertinence of what you're saying because the plaintiffs are an association. This is not a single person who's talking about a single transaction, like somebody has gone to jail and he says, I shouldn't have gone to jail. This is not – all that you're arguing doesn't seem to me to negate that there are people, that there are dealers who would be allowed under federal law to sell antique ivory because they would have the kind of permit that you say only means something rather more narrow than one might think. But there is no reason – you're not suggesting that nobody has such things. So all these questions that are raised, the question is, are they raised with respect to the people for whom the transaction would be lawful under federal law, whether we're talking about preemption or First Amendment or whatever? I think maybe a skip ahead of a baseline constitute, that is, that there is a difference between when the federal government makes something not unlawful and when it makes it lawful to the exclusion of state regulation. And so our argument is, especially in the context of our federalist system whereby states are not deemed to be excluded from action, including lawful bonds that are more restrictive than the federal government unless there's clarity that the federal government intended that, is that the provisions within the de minimis exceptions and the antique exceptions in the federal health rule are nothing more than a federal choice not to prohibit that as a matter of federal policy. If that's true, then we can't just sort of say, well, they're allowed to do it because federal government doesn't prohibit them. And that's the end of the inquiry with respect to whether the state government can say, no, we disagree that the state can prohibit them. And so in that context, the question becomes, is this just a scenario where the federal government has chosen not to restrict things as much as the state would for purposes of federal policy and is effectively silent with respect to what the states can do? That is the situation here. And we know that because of the history and text behind the federal law. I don't know. I'm looking at the language of the ESA preemption provision. It seems pretty broad. I don't know why you're suggesting that New York State can pass a law that makes it illegal to possess or even sell in interstate commerce the things that are covered by the de minimis and antiques exception. Because the de minimis and antiques exceptions are not those exemptions and permits for which more restrictive state laws can be displaced by federal law under the second clause of the first sentence of the federal preemption clause. I've got the federal preemption clause here in front of me. And the way it works is a series of sort of if the state law does this, then it's preemptive. And then it says, but even if it does that, then it's only preemptive. So let's walk through it first. Well, here's what it says, I think, in part. Any state law or regulation which applies with respect to interstate or foreign commerce in endangered or threatened species is void to the extent that it may effectively prohibit what is authorized pursuant to an exemption provided for in this chapter or in any regulation which implements this chapter. Exactly, Your Honor. So my argument is that the terms exemption or permits don't refer to what's happening in the federal elephant. Don't refer to what's happening. They don't refer to what is happening in the federal elephant rules of antiques and de minimis exceptions. So a state law which applies to interstate commerce, which plaintiffs here claim it does and it does not, is void to the extent that it may effectively prohibit what is authorized pursuant to an exemption or permit. They say the elephant rule is an exemption. That it's antiques and de minimis provisions that say, you know what? The prohibition of the normally applied interstate sale, it doesn't apply with respect to antiques as we define them, de minimis items as we define them, de minimis amounts by which we define them. But that's not an exemption for purposes of the Endangered Species Act, and specifically, but not limited to, the provision that you just read, which is that state laws— And if you notice, that exemption or permit language is not in the prior clause with respect to state laws that would allow more than the federal government prohibits. And so we see reflected in the legislative history of this provision, which was amended several times, an indication that when state laws choose to allow conduct that is more deleterious to imperiled species than the federal government does, any conflict will result in preemption. That's number one. Permit was prohibited by the chapter of regulations. However, with respect to state laws, which, as the I agree with the law here is, prohibit more activities than the federal government does, are more restrictive, are more protective of species. They are only preempted to the extent they authorize what is—or that they prohibit what is authorized or to include exemption or permit. And if I'm correct that exemption or permit means only specific things, then that clause does not—does not save the—does not support Plaintiff's argument that, therefore, the choice of the federal government, which is the choice for purposes of federal policy, to allow sales of de minimis and antiques provisions in a way that is less restrictive than a state might, prohibits the state from doing just that. And so that's why I point the Court's attention to Section 10, where it talks about what these exemptions and permits are. But also, I would just say I think clarity can be provided by looking at this Crescenti case, because I think the Crescenti case explains this quite well, as does the district court case in H.J. Justin and Sons, which is affirmed in part rehearsed in part on other grounds. That is at 519 F-1383. Both of these cases are mentioned in briefs and parts. But the Crescenti case makes it quite clear where the plaintiff there said, look, our activities are allowed without federal law. And the Court said that's not enough. It's not enough to simply be allowed because the federal government has chosen not to prohibit it. Okay. I think I understand your argument. If there are no other questions, you also got your money's worth. But these are interesting matters. All right. So we'll go back to Mr. Trotter. So, Mr. Trotter, you reserve two minutes. But given how far we've gone over with everybody, we're certainly prepared to give you more if you need it or if we need it. I'd like to start by returning to Judge Perez's question about is there an important distinction between a license condition and some other type of restriction. And I don't think there is any distinction that matters. The Department's witness acknowledged that the very purpose of including the display restriction as a license condition was to restrict speech. And I think that was made clear in the Department's argument today with why they feel that that was necessary to avoid a purchaser and a buyer or a purchaser and a seller speaking together at the same time. Turning to a question that Judge Sullivan had with the Department about how the Department defines interstate versus intrastate, I just want to make sure I point the court's attention. The Department's definitions are found in the record on page 100 within the Department license. So the express language is there. But I think that that discussion provides a good transition to why the display restriction is more extensively necessary under the First Amendment argument. And that's because with the Department's concern being so focused on purchasers and sellers being physically present, one simple alternative that the Department could have used to address that, they already have the annual reporting requirement where the dealers are required to every year tell the Department what happened to each unlicensed item and include a purchaser's contact information and name. They could also simply require proof that the item was shipped. And that would take away the ability for dealers to just hand it to someone surreptitiously. Related to that, the Department also points to the data on the number of items that have dropped significantly since the enactment of the law and the display restriction. But I think that only goes to show that the dealers are actually very responsible in following the law and display restriction. The Department's evidence says nothing about whether this lack, this drop in numbers reflects any sales or not. It just shows that dealers are abiding by the law and that there's no reason to think they would not continue to do so. Regarding other alternatives that are possibly theoretically available to the dealers, the record shows that none of the photograph catalog alternatives are actually sufficient at all. This is exactly why the Department's witness said the display restriction exists in the first place, because the Department understands that the only effective way that a buyer could receive the information necessary to know whether they want to purchase an item is by physically inspecting it. And so the Department has clearly targeted and chosen not just the most effective speech, but the only effective speech to limit it in order to prevent any sales other than the few items expressly licensed for intrastate sale to go forward. There was a brief discussion on the existing state laws, perhaps in reference to the Endangered Species Act's savings clause. We touched on this in our reply brief, but I think that the state's focus on Congress allowing states a leeway ignores that when you look at the cases cited by the Department and their opposition, all those cases more or less were concerned with species that are present in the states either because they're native or migrating through the state. Similarly, the contemplation in such a clause was not to apply to species from outside of the state. And then a final couple of points addressing the interveners. There is nothing in the record that discusses how even Congress and antiques could encourage commodification generally, so I can't really address the points that they raise on that. And then as to the type of exemptions that are contemplated by the preemption provision. We note this in our reply brief starting on page 9, where Dr. Erickson and Ms. Schaffer did the page 10, that the antiques and the venice exemptions are precisely the kind of exemptions that are contemplated by the express preemption provision. Well, can we stop you there? I mean, let's have you then respond to what was just said by Mr. Henry, who says that there's a difference between an exception and an exemption and that you're conflating the two. So I want you to respond to that. Well, I think the words are essentially used interchangeably, exception or exemption. There's no meaningful difference. What I think is important is that both the antiques and the minimuses, well, to set back, the preemption provision itself is found in Chapter 35 of Title IX of the U.S. Code. The antiques exception is also found there as well as Section 1535 of that. And even the minimus one is found in Chapter 35 of 50 CFR starting at 17.40. But it says expressly that the regulations in that part implement the ESA going back to these types of exemptions or exceptions. So I mean, very clearly, this is exactly the type of exception or exemption contemplated, and the State has not challenged that in their conclusion. All right. But I think what Mr. Henry was saying is that exemption is a very specific term, and it's defined and it doesn't mean the exceptions that are at issue here, the minimus and antiques exceptions. And so you're disagreeing with that, but, I mean, he pointed to a provision, which I'm going to jot it down, which defines exemptions. So do you have a response to that? He did mention some things about, I don't remember the specifics, because as far as I recall, this is the first time that those specifics have been pointed out. In this case, I did not recall those being in their response brief. So I'm not prepared to address that more directly. And then I guess my final point is that in addressing the proposed alternative by the dealers of segregation and labeling, the district court noted that that proposed alternative was not as effective as the display restriction. But as we discussed in our briefs, that's not the standard under this court's precedence or the Supreme Court. That would, in fact, incentivize the government to enact each thing else first. It would also lift the burden of proof, which is probably on the government to show that their proposed alternatives are as effective. But the actual standard is that it must be shown that the proposed alternative is ineffective  And that's confirmed by this court's decisions in that early case as well as in the New York State case. And the rest of the panelists, any further questions? I'm happy to conclude there. All right. Well, thank you all. Very well reviewed. Interesting matter. We will reserve decision, naturally. That concludes our arguments on the calendar for today. We have one case on submission. Before we conclude, I want to thank Ms. Beard. I want to thank our court security officer. I think we appreciate more now than ever just how nice it is to be back in a courthouse. But also it requires a lot of folks. When we were on Zoom, I always thank the IT people, and appropriately so. But it's good to thank everybody who makes this such a pleasant place to work and argue. It's a privilege to be here. I'm sure you feel that way, too. So thanks. All right. We'll adjourn. Thank you.